**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-622-APM** |
| **MITCHELL TODD GARDNER, II** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Mitchell Todd Gardner, II to 71 months' incarceration,[1] three years of supervised release, $3,500 in restitution, and the mandatory $100 special assessment for each felony count of conviction. The guideline range calculated by the government is 57-71.

### I.  INTRODUCTION

Defendant Gardner violently participated in the January 6, 2021 attack on the United States Capitol – an attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, including members of the United States Capitol Police ("USCP") and the Metropolitan Police Department ("MPD"), and resulted in more than 2.8 million dollars' in losses.[2]  Gardner directly contributed to the violence and damage unleashed on January

---

[1] The recommendation is based on an upward departure pursuant to U.S.S.G. § 3A1.4, cmt. n.4.

[2] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

6, 2021.

After watching other rioters repeatedly assaulting law enforcement officers in the Lower West Terrance ("LWT") entrance to the Capitol – a scene that horrified people around the world – Gardner encouraged rioters to "pull the cops out" of the LWT tunnel, urged rioters to "break the fucking window" using a construction ladder, and unleashed Oleoresin Capsicum ("OC") spray directly onto officers in the LWT tunnel.  Thereafter, he used the OC cannister, which belonged to the MPD, in an attempt to bash in a window into the Capitol.  With the help of other rioters, that window was eventually broken, allowing Gardner and numerous other rioters to enter the building. From inside, Gardner encouraged others to come closer, and handed a broken piece of furniture to another rioter (which was soon used as a weapon against the police officers in the tunnel). Eventually, Gardner exited through the broken window, but did not leave the grounds.  Instead, he lingered outside the LWT tunnel, cheering on rioters as they continued to assault police.

The government recommends that the Court sentence Defendant Gardner to 71 months' incarceration, which includes an upward departure contemplated by the parties' plea agreement.[3] A 71-month custodial sentence is sufficient but not greater than necessary to meet the requirements of 18 U.S.C. § 3553(a), particularly considering the gravity of his crimes.

## II.     FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers to the court to the stipulated Statement of Offense and Pre-Sentence Report filed in this case, ECF 49 and 52 respectively, for a short summary of the January 6, 2021

---

[3] *See* section 5 C. of the plea agreement letter.  (ECF No. 48.). To the extent the Court does not apply the departure, the government seeks an upward variance pursuant to section 6 of the plea agreement, given the prolonged violence perpetrated by the defendant.

attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

On January 6, 2021, hundreds of rioters, unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election. Many rioters attacked and injured law enforcement officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day.

On the West Front of the Capitol grounds, rioters approached the building on January 6, 2021, as depicted in Government's Exhibit 1.  The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing with AREA CLOSED signs. USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A.  At 12:52 p.m., the first breach of the outer perimeter occurred at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier.  By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1.  They flooded the area labeled "Lower West Plaza," Area C on Government's Exhibit 1, pushing against the barricade there.



**Exhibit 1**[4][5]

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and

the growing number of USCP officers responding to the area, the crowd remained at this location

for less than a minute, pushing through and over the fence to the front of the plaza.  For the next

hour and a half, a growing number of police officers were faced with an even faster growing

number of rioters in the restricted area, the two sides fighting over the establishment and

---

[4] Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.

[5] A note about how exhibits herein are labeled:  Photos and videos are named Exhibit x, y, z, etc.  Stills from video exhibits where the videos are included are named Exhibit x-1, x-2, etc.  Stills from videos where the videos themselves are not included are named xA, xB, etc.

reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site, as depicted in Government's Exhibits 2A-B and 3A-B.



**Exhibit 2A**                    **Exhibit 2B**[6]



**Exhibit 3A**                    **Exhibit 3B** [7]

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.   At 2:03 p.m., Metropolitan Police Department officers

---

[6] Exhibits 2A-B are stills from USCP security footage showing the progression of the crowd from the outer barricades (2A) and beginning to fill the Lower West Plaza (2B).

[7] Exhibits 3A-B are stills from USCP security footage showing the breach of the West Plaza.  The breach of the barricades (3A) was followed by the formation of a USCP officer wall until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (3B).

responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.  It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b).  All people must leave the area immediately.  This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.  On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

By 2:28 p.m., several large gaps appeared in the police defensive line at the West Front and a general retreat was called.  The rioters had seized control of the West Plaza and the inauguration stage, as depicted in Government's Exhibit 4.  There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.


**Exhibit 4**[8]

---

[8] Exhibit 4 shows the breakthroughs in the defensive line up onto the inaugural stage.

***Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building***

The fighting in the Lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line. *Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace ("LWT"), as described in the Statement of Offense. (ECF No. 49.) That tunnel leads into the basement of the Capitol Building, which allows access throughout the building. The exterior of the tunnel is framed by an archway, which has been the backdrop for nine presidential inaugurations, and is the entrance for the President-Elect and other dignitaries on Inauguration Day, as seen in Government's Exhibit 5.



**Exhibit 5[9]**

---

[9]   Architect of the Capitol, available at: https://www.aoc.gov/what-we-do/programs-

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby.  Members of the USCP, assisted by officers from the District of Columbia's MPD, were guarding the entrance; many who had already physically engaged with the mob for over an hour, having reestablished a defense line here after repositioning from  the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and ultimately  pushed their way through the second set of doors, physically engaging law enforcement with batons, poles, chemical spray, bottles and other items.  At a later hearing on the events of January 6, Congresswoman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people.  And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me.  So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in.  That's about from the distance where I'm sitting here on the dais to that back wall.  And from that office in close proximity to where you all held the line, I listened to you struggle.  I listened to you yelling out to one another.  I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall.  And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight."  Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer Hodges: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at    https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-

ceremonies/inauguration.

attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers. The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the previously mentioned assault of Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force. Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle. *Id.* (Statement of Sgt. Aquilino Gonell)

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor. MPD Officer Michael Fanone remembers one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service. *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters.  It is not an exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including potential harm to members of Congress.

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing

those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred members of law enforcement. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with law enforcement officers. *See id*. at 27-30.

Moreover, the rioters inflicted significant emotional injuries on law enforcement officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24,

2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-
AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The
attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.8
million dollars.

### B.    Gardner's Role in the January 6, 2021 Attack on the Capitol

Defendant Gardner can be recognized by the clothing he wore on January 6, 2021,  as
depicted in Government's Exhibits 6 and 7.



**Exhibit 6**            **Exhibit 7**

On or about January 6, 2021, Gardner traveled from Florida to Washington D.C.  He was
in proximity to the "Stop the Steal" rally, which was held on the Ellipse (Gardner was in an area
closer to the Washington Monument). After the rally, Gardner walked from the Washington
Monument area of D.C. via Pennsylvania Avenue to the U.S. Capitol.

Gardner's crimes were captured on January 6, 2021 though open sources, body worn
camera ("BWC") worn by members of MPD, and Closed-Circuit Television ("CCTV") operated
and maintained by the USCP.  All video exhibits have been provided to the Court prior to
sentencing.

Gardner entered the restricted grounds of the Capitol by passing the Peace Circle
Monument and walking with the crowd heading closer to the Capitol Building, as seen in

Government's Exhibit 8.



**Exhibit 8[10]**

***Gardner on the West Plaza***

Gardner was not deterred by the crowds surrounding him on the West Plaza, a restricted area of the Capitol Grounds; rather, he advanced closer to the Capitol Building.  He was on the West Plaza by mid-afternoon on January 6, 2021, as seen in Government's Exhibits 9 and 10.

---

[10]    Still    from    an    open-source    video    that    can    be    viewed    at: https://web.archive.org/web/submit?url=https://video.parler.com/dC/oF/dCoFQ7vYjoby.mp4 Timecode: 0:03



**Exhibit 9[11]**



**Exhibit 10[12]**

Undeterred by the thousands of people, Gardner used a temporary stairwell erected for the Inauguration to get closer to the Capitol building by accessing the Lower West Terrace, as seen in Government's Exhibit 11.

---

[11]          Photo                    available                    at: https://www.facebook.com/photo/?fbid=3878128392220544&set=pcb.3878131488886901

[12] Still from an open-source video that can be viewed at: https://capitol-hill-riots.s3.us-east-1.wasabisys.com/User%20Submissions%20-%20UNSORTED/Content/Trump%20Wild%20Rally%20Washington%20D.C._%20Outside%20The%20Capitol%20Building%20%20%28Part%2004%29%20%28January%206th%2C%202021%29.mp4 Timecode: 7:10



**Exhibit 11[13]**

*Gardner on the Lower West Terrace*

Once on the Lower West Terrace of the U.S. Capitol, Gardner pressed his way through

hundreds of rioters to get close to the LWT tunnel, as seen in Government's Exhibits 12A and

12B.



**Exhibit 12A[14]**

---

[13]      Still      from      an      open-source      video      available      at:
https://web.archive.org/web/submit?url=https://video.parler.com/KD/H6/KDH68TyHUiw5.mp4
Timecode: 0:03
[14]   Photo   taken   by   William   Gabriel   Allen-Dupraw.   Images   available   at:



**Exhibit 12B**[15]

Once at the Lower West Terrace tunnel, Gardner encouraged rioters to assault police inside the LWT tunnel by repeatedly yelling, "pull the police out," "pull the cops out," and "grab their hands and pull them out."  Government's Exhibit 13[16] is a nine-minute and seven-second video, depicting this conduct.  Several stills from Government's Exhibit 13[17] are incorporated herein.



**Exhibit 13-1**[18]



http://www.willallendupraw.com/#/chaos-at-the-capitol
[15] Still from video taken by another target.
[16] Open-Source video entitled, "Political Trance Tribune Civil Rights Auditor Encounters." This video is not necessarily continuous or in chronological order.
[17] The video is "modified" with: a yellow outline around Defendant Gardner, to increase his visibility in the crowd; purple text bubbles of Gardner's screaming directions to other rioters; and a white square around the OC spray cannister.
[18] Still from Exhibit 13. Timestamp: 00:28.

16



**Exhibit 13-2[19]**



**Exhibit 13-3[20]**



**Exhibit 13-4[21]**

---

[19] Still from Exhibit 13. Timestamp:  00:40.
[20] Still from Exhibit 13. Timestamp: 00:52.
[21] Still from Exhibit 13. Timestamp: 1:01.

The rioters obtained MPD's MK-46 OC spray cannisters. [22]   The rioters, including Gardner, took turns assaulting the police with this chemical.



**Exhibit 13-5**[23]



**Exhibit 13-6**[24]

---

[22] MK-46, MPD crowd control equipment.   https://www.defense-technology.com/product/first-defense-1-3-mk-46h-stream-oc-aerosol/ The MK-46 features a trigger handle, is intended for us in crowd management and will deliver 26 short bursts of OC at an effective range of 25-30 feet.  This chemical irritant is designed to cause burning of the eyes, coughing, and incapacitation.
[23] Still from Exhibit 13. Timestamp: 1:58.
[24] Still from Exhibit 13. Timestamp: 2:32.



**Exhibit 13-7**[25]

Gardner unleashed OC spray, paused, and then again pulled the trigger handle, continuing to directly spray the officers defending this key entrance to the Capitol.[26]  Gardner did not stop on his own accord – he only stopped when the cannister was empty.  The OC spray Gardner assaulted officers with a dangerous weapon when used in this manner.



**Exhibit 13-8**[27]

---

[25] Still from Exhibit 13. Timestamp: 2:41.
[26] In Government's Exhibits 13-8 and 13-9, the sleeve of Gardner's brown, leather jacket can be seen (circled in yellow) holding the OC spray cannister.
[27] Still from Exhibit 13. Timestamp: 2:53.



**Exhibit 13-9[28]**

Other video captured a full image of Gardner assaulting officers with OC spray from, as depicted in Government's Exhibit 14.[29]



**Exhibit 14[30]**

The spray is also captured on CCTV, as depicted in Government's Exhibit 15.

---

[28] Still from Exhibit 13. Timestamp: 2:59.
[29] 40 second video taken from another yet-to-be-charged target's phone during investigation.
[30] Still from Exhibit 14.  Timestamp is 0:13 – 0:19.



**Exhibit 15[31]**

The 4:02 p.m. OC spray by Gardner was captured on the BWC of MPD Officer J.L., as seen in video Government's Exhibit 16.



**Exhibit 16-1[32]**

After assaulting officers with OC spray, Gardner yelled for rioters to gain access into the

---

[31] Still from Exhibit 15, assaults with OC spray by Gardner.  Time of day is 4:02:46 -  4:02:53 p.m.

[32] Still from Exhibit 16, second spray by Gardner. Timestamp: 0:37. Time of day is 4:02:52 p.m.

Capitol through a window, and he encouraged others to break the window.



**Exhibit 13-10**[33]

Gardner directed other rioters to use a large orange ladder, ostensibly abandoned by workers building the Inaugural stage, to get to a window in the Capitol.



**Exhibit 13-11**[34]

---

[33] Still from Exhibit 13. Timestamp: 7:01
[34] Still from Exhibit 13. Timestamp: 8:00.



**Exhibit 13-12[35]**



**Exhibit 13-13[36]**

The orange ladder is also captured on CCTV, as is Gardner's arm (circled in yellow)

reaching up to redirect the ladder to the window of Capitol room ST-2M, as depicted in

---

[35] Still from Exhibit 13. Timestamp: 8:06.
[36] Still from Exhibit 13.  Timestamp: 8:52.

Government's Exhibit 17.[37]



**Exhibit 17**

Gardner used the MPD MK-46 OC cannister to participate in the breaking of a window into room ST-2M of the U.S. Capitol building, as depicted in Government's Exhibit 18.[38]



**Exhibit 18-1**[39]

---

[37] CTV.  The time of day is 4:07:54.
[38] Exhibit 18 is 37 seconds from an open-source video.
[39] Still from Exhibit 18.  Timestamp:  00:01.

24



**Exhibit 18-2**[40]



**Exhibit 18-3**[41]

---

[40] Still from Exhibit 18.  Timestamp: 00:02
[41] Still from Exhibit 18.  Timestamp:  00:06.



**Exhibit 18-4[42]**

Gardner assisted others up onto the ledge outside room ST-2M and raised his arm victoriously, as seen in  Government's Exhibit 19.[43]



**Exhibit 19-1[44]**          **Exhibit 19-2[45]**

Gardner also encouraged and helped other rioters through the broken window into room ST-2M.  Gardner then climbed through the window himself and entered ST-2M.

---

[42] Still from Exhibit 18.  Timestamp:  00:15
[43] Exhibit 19 is a 2 minute 37 second open-source video.
[44] Still from Exhibit 19.  Timestamp is timestamp 00:06.
[45] Still from Exhibit 19.  Timestamp: 00:17.



**Exhibit 19-3**[46]
***Gardner Inside the Capitol in Room ST-2M***

Once inside, Gardner talked to other rioters.  As seen in Exhibit 20, [47] Gardner is pointing,

motioning and talking to other rioters appearing to  direct them to do something.



**Exhibit 20-1**[48]

---

[46] Still from Exhibit 19.  Timestamp 01:13.  Gardner is encouraging and helping others through
the window.
[47] Exhibit 20 is a 15 second video obtained from the phone of another January 6 defendant.
[48] Still from Exhibit 20.  Timestamp: 00:02.

Once inside room ST-2M, Gardner attempted to help someone up into the Capitol and waved others to approach the window, as shown in Government's Exhibit 21.[49]



**Exhibit 21-1**[50]



**Exhibit 21-2**[51]
Gardner can be seen encouraging other rioters to come closer.

---

[49] Exhibit 21 is a 32-minute 14 seconds excerpt from a video entitled "Full Footage" video.  The entire hour-plus video is available at:  https://www.youtube.com/watch?v=iNFcdpZdkh0.
[50] Still from Exhibit 21.  Timestamp at 25:24.
[51] Still from Exhibit 21.  Timestamp: 25:56.



**Exhibit 21-3[52]**

Gardner then handed a broken piece of furniture (what appears to be a leg from a table with a metal nail sticking out of it) out to another rioter, as seen in Government's Exhibit 21-4.  There was no purpose for Gardner to hand this dangerous item to another rioter other than for it to be used as a weapon, which it was.  In fact, an identical table leg with nail (presumably the very same weapon) was later used by another rioter to assault officers[53] in the LWT tunnel, assaults that can be seen in Exhibits 25-1 through 25-3.

---

[52] Still from Exhibit 21.  Timestamp:  25:58.
[53] Another rioter has pled guilty to a violation of 18 U.S.C. § 111(b) for using this table leg to assault police. *See United States v. X*, 2X-cr-XXX-XXX (ECF No. X).



**Exhibit 21-4**[54]

Gardner directed rioters inside ST-2M in their attack on the Capitol; as rioters called for a crowbar, Gardner moved closer to the window and helped take the other half of a semi-circle window out of the pane creating another access point into the building, as seen in video Government's Exhibit 22.[55]   This allowed another access point into the building.   ST-2M was trashed by the rioters.   According to the Architect of the Capitol, furniture was overturned and broken, windows were smashed out, a door was missing, and blood had been smeared on the wall.

---

[54] Still from Exhibit 21.  Timestamp:  26:38.
[55] Exhibit is a 2 minute 30 second video obtained from another January 6 defendant.



**Exhibit 22-1**[56]                    **Exhibit 22-2**[57]



**Exhibit 22-3**[58]                    **Exhibit 22-4**[59]

[56] Still from Exhibit 22.  Timestamp: 0:12.
[57] Still from Exhibit 22.  Timestamp: 0:39.
[58] Still from Exhibit 22.  Timestamp: 0:58.
[59] Still from Exhibit 22.  Timestamp: 2:21.

### *Gardner Outside the Capitol and Still on Restricted Grounds*

Eventually, Gardner exited the Capitol building, but not the grounds. He lingered outside the LWT tunnel cheering on rioters as they continued to assault police, as seen in video Government's Exhibit 23.[60]



**Exhibit 23-1**[61]



**Exhibit 23-2**[62]

---

[60] Exhibit 23 is a 1 minute 22 second open-source video.
[61] Still from Exhibit 23.  Timestamp 0:42.
[62] Still from Exhibit 23.  Timestamp: 00:35.

Defendant Gardner can also be seen on CCTV video for several minutes in the late afternoon, in Government's Exhibit 24.[63]  At times Gardner is beckoning others closer to the battle; cheering on the mob, which was spitting on, yelling at, and blinding the police with a strobe light; and calling out as other rioters assaulted police with any and all weapons, including the table leg with nail.  Government's Exhibits 24-1 through 24- 2 are stills from Exhibit 24.[64]



**Exhibit 24-1**

**Exhibit 24-2**

---

[63] CCTV 4:48:57 – 4:56:33 p.m.
[65] Exhibit 26 is from a documentary by Alex Holder.  A yellow box has been placed around Gardner to make him more visible.

The table leg with nail that Garder handed out to the crowd was used to assault officers, as seen in Government's Exhibits 25-1 through 25-3.



**Exhibit 25-1**



**Exhibit 25-2**



**Exhibit 25-3**

Gardner engaged in one final assault on police before the day was over.  While on the West

Plaza late in the day, Gardner and others collectively pushed against the police in the tunnel, as

seen in Exhibit 26.



**Exhibit 26-1**[65]

---

[65] Exhibit 26 is from a documentary by Alex Holder.  A yellow box has been placed around
Gardner to make him more visible.

*Injuries*

OC spray is known to cause respiratory, skin, or eye irritation, and could cause serious toxicity if inhaled.[66]  Several officers who were in the Lower West Terrace tunnel when Gardner deployed the OC cannister were interviewed and reported impaired vision and burning skin.  MPD Officer J.L. who was hit directly by the OC spray Gardner unleashed reported, that he removed his gas mask in order to breathe easier.  Once his mask was off he received a direct hit in the face from a large stream of OC spray from an MK46. After being hit with the stream of OC spray he could not see and believed he was now "combat ineffective". Officer J.L. was in constant pain for several hours after receiving the direct spray of OC, and even 18 months after the attack, some of his riot gear burns due to the large amount of OC spray spayed on the equipment.

Gardner's participation in this riot aided those rioters who also injured officers and destroyed property.  *See* Section II(A) ("Injuries and Property Damage Caused by the January 6, 2021 Attach") *supra.*  His violent conduct served to incapacitate officers allowing for the continued violence against them.  Gardner's conduct also incited and emboldened other violent rioters around him.

MPD Commander Kyle described the events on the Lower West Terrace in a video victim impact statement, as seen in Government's Exhibit 27.

---

[66]                                                        https://www.medicalnewstoday.com/articles/238262; https://www.forbes.com/sites/judystone/2016/03/16/lethal-in-disguise-the-health-hazards-of-pepper-spray/?sh=6390cf3e297; https://www.poison.org/articles/how-dangerous-is-pepper-spray201#:~:text=Inhalation%20exposures%20can%20cause%20coughing,%2C%20wheezing%2C%20and%20skin%20blisters; http://fifthdcs.com/FifthPolicy/index.cfm?policy=OcSpray

### III.    THE CHARGES AND PLEA AGREEMENT

On October 8, 2021, a federal grand jury returned a superseding indictment charging Gardner with Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b); Destruction of Government Property and Aiding and Abetting, in violation of 18 U.S.C. §§ 1361 and 2; Entering or Remaining in any Restricted Building or Grounds, in violation of 18 U.S.C. §§ 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4); Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F); and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On June 27, 2022, Gardner pled guilty to Count One, Civil Disorder in violation of 18 U.S.C. § 231(a)(3);  Count Two, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; and Count Three, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C.  §§ 111(a)(1) and (b), based on a guilty plea entered pursuant to a plea agreement.

### IV.    STATUTORY PENALTIES

Gardner now faces sentencing on Counts One, Two, and Three of the Indictment.

As noted by the plea agreement and the U.S. Probation Office, Gardner faces up to 5 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three

years for Count One; 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Two; and up to 20 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Three; and a $300 special assessment.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

Although it reaches the same offense level contemplated by the plea agreement, the final PSR does not provide a separate guideline calculation for each of the three counts for which Defendant Gardner has pled guilty. The Guidelines set out the specific "order" of the analysis: first, determine the offense guideline; second, determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3.  U.S.S.G. § 1B1.1(a)(1)-(3).  *Then*, repeat each step for each count.  U.S.S.G. § 1B1.1(a)(4).  *Finally*, perform the grouping analysis in Part D of Chapter 3.  *Id.*

This specified procedure did not occur in the PSR.  Rather, Probation started with the grouping analysis in Part D of Chapter 3, PSR ¶¶ 39-41, then did the Guidelines analysis in U.S.S.G. § 1B1.1(a)(1)-(3), but only for Count Three, PSR ¶¶ 43-53.

The appropriate offense level computations for Counts One, Two, and Three prior to any grouping analysis under Part D of Chapter 3, are as follows:

**Count One: 18 U.S.C. § 231(a)(3) - Civil Disorder**

| Base Offense Level | 14 | U.S.S.G. § 2X5.1 |
|---|---|---|
| Cross Reference Base Offense Level | 14 | U.S.S.G. §2A2.2 (a)[67] |
| Special Offense Characteristic | +4 | U.S.S.G. §2A2.2 (b)(2)(B): "the offense involved the use of a dangerous weapon." |
| Adjustment | +6 | U.S.S.G. §3A1.2 (a) and (b): "the offense involved an official victim." |
| Total | 24 | |

**Count Two: 18 U.S.C. § 1512(c)(2) and § 2 - Obstruction of an Official Proceeding Before Congress, and Aiding and Abetting**

| Base offense level: | 14 | U.S.S.G. §2J1.2 (a) |
|---|---|---|
| Special Offense Characteristic | +8 | U.S.S.G. §2J1.2 (b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." |
| Special Offense Characteristic | +3 | U.S.S.G. §2J1.2 (b)(2): "the offense resulted in substantial interference with the administration of justice." |
| Total | 25 | |

**Count Three: 18 U.S.C. § 111(a) and (b) - Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon**

| Base Offense Level: | 14 | U.S.S.G. §2A2.2(a) |
|---|---|---|
| Special Offense Characteristic | +4 | U.S.S.G. §2A2.2 (b)(2)(B): "the offense involved the use of a dangerous weapon." |
| Special Offense Characteristic | +2 | U.S.S.G. §2A2.2 (b)(7): convicted under 111(b) |
| Adjustment | +6 | U.S.S.G. §3A1.2 (a) and (b): "the offense involved an official victim." |
| Total | 26 | |

**Grouping Analysis**

As the PSR notes, Counts One, Two, and Three group together. PSR ¶¶ 39-41. Counts One and Three group because the offense involved the same victim (the police officers in the LWT

---

[67] 2A2.2 applies via the operation of the 2A2.4(c)(1) cross reference

Tunnel) and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan. USSG § 3D1.2(b).  Counts One and Three group with Count Two because they embody conduct (causing physical injury) that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to Count 2. USSG § 3D1.2(c).  For counts grouped pursuant to USSG §3D1.2(a)-(c), the offense level applicable to the group is the offense level which produces the highest offense level, in this case Count Three, therefore, the combined offense level for the Group is 26.

The U.S. Probation Office calculated Gardner's criminal history as category I, which is not disputed. *See* PSR ¶ 57.  Accordingly, based on Gardner's total adjusted offense level, after acceptance of responsibility, of 23, Gardner's Guidelines range is 46 to 57 months' imprisonment. Defendant Gardner's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

### Upward Departure Pursuant to 3A1.4

Pursuant to U.S.S.G. 3A1.4, as allowed in paragraph 5 C. of the plea agreement, the government recommends a two-level upward departure.[68] Section 3A1.4 allows for an adjustment to the Guidelines range where the defendant's offense of conviction "involved, or was intended to promote, a federal crime of terrorism," as  defined by 18 U.S.C. § 2332b(g)(5).  U.S.S.G. § 3A1.4, cmt. n.1.  Where, as here, a defendant's conviction was not for, or was not "intended to promote," an *enumerated* "federal crime of terrorism," an upward departure is still warranted under U.S.S.G. § 3A1.4, cmt. n.4(A) ("Note 4(A)") if "the offense was calculated to influence or affect the conduct

---

[68] The government's request for a two-level departure pursuant to U.S.S.G. §3A1.4 n.4 is limited to the facts of this case. This request is driven by, among other things, the defendant's degree of violent conduct, and the degree of his intent, planning, or coordination.

of government by intimidation or coercion, or to retaliate against government conduct."  An upward departure is appropriate here because Gardner's conduct that led to his three convictions, "were calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

The government bears the burden to prove that the Note 4(A) departure is applicable by a preponderance of the evidence, based on all relevant conduct. *United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 190 (D.D.C. 2018).  In this case, the evidence clearly shows that Defendant Gardner's conduct was calculated to influence, affect, or retaliate against government conduct.[69]

First, the evidence shows that Gardner carried out coercive and intimidating acts targeting the U.S. government by attacking its agents, namely officers of both the USCP and MPD as they sought to defend the Capitol building and the members of Congress inside.  Gardner engaged in repeated, prolonged, and significant violence against the defending officers near the Lower West Terrace tunnel, while he was in very close proximity to them—essentially hand to hand combat. Gardner somehow took possession of this MPD-issued, crowd control pepper spray distribution device once he was involved in the "medieval" battle.  In particular, Gardner discharged the contents of an OC MK-46 incapacitation device twice against officers jammed into the tight

---

[69] Notably, the upward departure under Note 4(A) may be appropriate even if influencing, affecting, or retaliating against the government was not the defendant's sole motive or sole purpose.  For example, the D.C. Circuit has held (applying a prior version of Section 3A1.4) that a defendant's "money-raising goals obviously do not preclude a finding of intent to influence government policy," even if raising money was the defendant's "primary purpose." *United States v. Haipe*, 769 F.3d 1189, 1193 (D.C. Cir. 2014); *see also, e.g.*, *United States v. Awan*, 607 F.3d 306, 317 (2d Cir. 2010) (offense may be calculated to influence, affect, or retaliate against government conduct even if a defendant's "particular *motivation . . .* is to impress a more established terrorist with his abilities") (emphasis in original); *United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018) (enhancement may apply even if the defendant's conduct "was also calculated to accomplish other goals simultaneously").

confines of the tunnel.  The OC spray Gardner used to assault  MPD officers causes burning of the eyes, coughing, and incapacitation.  The officers were in the throes of protecting the Capitol and those inside who were in dire need of that protection.  Gardner then used that OC cannister to break a window he and others used to access room ST-2M of the building.  After Gardner had already breached the Capitol building, he handed a broken piece of furniture to another rioter outside the building, encouraging further violence against the officers.  There is nothing in Gardner's history that demonstrates a prior animus towards police, which indicates that on January 6, 2021, Gardner's actions were calculated to target, influence, and retaliate against the Congresspeople and other government officials whom the police were defending.  After Gardner exited ST-2M, he not only continued to encourage and cheer on other rioters in their attack on police, but himself engaged in one last assault by joining with others to push against the police in the tunnel.  He only ceased this assault when overtaken by a chemical irritant dispersed by police.

Second, Gardner's intent to influence, affect or retaliate against government is clear from his words.  Gardner can be heard shouting "pull the cops out," "grab their arms and pull them out," and "fight for Trump" during his sustained attack on the police defending the Capitol.  He also shouted directions to other rioters, urging them to use a ladder to "break the window, use it to break the window" of the Capitol.  His stated intent to destroy the window leading into the building was made even more obvious shortly thereafter when he used the OC spray bottle to bash out that same window. This breach allowed Gardner and many other rioters to gain access to the Capitol, where they trashed the room and attempted to access other parts of the building.

There could be no reason to "pull the cops" from their location defending the Capitol and get inside the Capitol by breaking a window other than his desire to impact or retaliate against the

government business occurring inside.  Gardner's statements, particularly in the context of his actions described above, demonstrate his intent to intimidate, affect, and retaliate against the government by impeding and interfering with the officers' ability to protect the Capitol, ultimately causing the legislators to evacuate from their chambers and cease performing their constitutional duties.

Indeed, Gardner admitted as a part of his plea agreement, that his criminal conduct on January 6, 2021, was done to obstruct, influence, and imped Congress's certification of the Electoral College vote (*see* Statement of Offense, ECF 49, p.7.)  By engaging in the prolonged, violent battle against law enforcement in the tunnel, breaking into the Capitol, entering the Capitol, and urging others to participate in violence, Gardner had to be aware that his actions contributed to endangering the people inside the Capitol.

Third, Gardner's choice of target—the United States Capitol building— coupled with the level of violence directed at the police protecting the building further evidences his intent to intimidate, affect, or retaliate against the government.  As Judge Cooper explained in applying the terrorism enhancement in *United States v. Abu Khatallah*,[70] 314 F. Supp. 3d 179, 198 (D.D.C. 2018), a defendant's specific intent to influence and retaliate against government conduct can often "be inferred from the defendant's choice of target."  Attacking a government facility that is "a physical manifestation of the U.S. government . . . suggests a desire to retaliate against or influence that government." *Id.* at 199.  That is why, "[u]nsurprisingly . . . , several courts have applied and upheld the terrorism enhancement for defendants who targeted government facilities." *Id.* (citing

---

[70] In *Khatallah*, the full adjustment (12 levels, CHC 6) was applied because that defendant was convicted of offenses that are enumerated in 18 USC 2332b(g)(5).

cases).

Clearly, attacking the United States Capitol—the legislative seat of our government—while the entire complement of legislators and the Vice President of the United States are inside performing their constitutional and statutory duties is a strong indication of intent to influence or retaliate against the government. No one can seriously doubt, with these specific facts, that Gardner wanted to influence government by means of force.

In sum, the defendant's words and actions meet the requirements of U.S.S.G. § 3A1.4, Note 4(A), and an upward departure is warranted. The facts that support this departure are also relevant to the Court's assessment of the sentencing factors under 18 U.S.C. § 3553(A), which follow. The government seeks this enhancement to ensure that cases that involve extreme, violent behavior, are appropriately highlighted before any Court, so long as the guideline appropriately applies.[71]

Here, Gardner helped lead an aggressive charge over the course of lengthy period, at a critical pinch point, while using a dangerous OC spray on police in a crowded tunnel filled with police doing their best to protect the Capitol, as well as urging other rioters to attack police. This outrageous conduct is made all the more culpable because he was deploying this violence "to influence or affect the conduct of government," or "to retaliate against it." As such, the conduct falls squarely within U.S.S.G. § 3A1.4, Note 4(A).

Given the various factors as described throughout this memorandum, the government seeks a two-level upward departure., emphasizing the defendant's assaultive conduct and his intent to

---

[71] In the January 6, 2021 context, the government has sought such an enhancement twice: in *United States v. David Judd*, 21-cr-40-3-TNM and *United States v. Guy Reffitt*, 21-cr-32-DLF. Both judges declined application.

disrupt Congress through intimidation and coercion.  Such a departure is justified by the crimes Gardner committed.

***Total Adjusted Offense Level***

Accordingly, the government's calculation of the defendant's total adjusted offense level including its' request for a two-level departure is 25, his criminal history score is category I (PSR ¶¶ 54-62), and the guidelines range is 57 to 71 months' imprisonment.  Based on this adjustment, we now seek a term of imprisonments of 71 months.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).  As described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Gardner's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the Certification Vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of Gardner's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 71 months' incarceration.

### B.  The History and Characteristics of the Defendant

Gardner has two prior convictions, one for operating a vehicle while impaired and another for possession or sale of drugs.  These do not result in criminal history points because they occurred over 15 years ago.  Gardner reported drug use to the probation officer, but he has been drug-free since 2019 – so that played no role in his conduct on January 6.  His conduct on

January 6, 2021, demonstrates a violent character and disrespect for law enforcement.

**C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.  Gardner's criminal conduct, assaulting  law enforcement officers, breaking into the Capitol, encouraging other rioters, providing a weapon to an angry mob, and corruptly obstructing an official proceeding, is the epitome of disrespect for the law.

**D.      The Need for the Sentence to Afford Adequate Deterrence**

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B).  The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[72] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

As this Court noted during sentencing in *United States v. Thomas Webster*, 21-cr-208-APM, "We simply cannot have a country in which when people are on the losing side of an election, you think you can use violence and physical force to undo that result." Tr. 9/1/2022 at 62.  Imposing a significant sentence will serve as a general deterrent to others who may think it is acceptable to engage in conduct similar to Gardner's in the future.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

---

[72] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

weighs heavily in favor of a lengthy term of incarceration.  Although Gardner has a criminal history category of I, his conduct on January 6, 2021 was egregious.  To date, there has been no indication that Gardner has any remorse for his actions on January 6, 2021.  *See United States v. Matthew Mazzocco*, 1:21-cr-00054-TSC, Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol.  It didn't come when he went home.  It came when he realized he was in trouble.  It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.  It came when he realized that he could go to jail for what he did.  And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every

sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[73]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases – cases generally involving violence against law enforcement and with dangerous weapons – provide suitable comparisons to the relevant sentencing considerations in this case.

As of the date of this sentencing memorandum, several felony Capitol Riot defendants have been sentenced that can be viewed here: https://www.justice.gov/usao-dc/capitol-breach-cases.

---

[73] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

*United States v. Wilson*, 21-cr-345-RCL.  While on the Lower West Terrace, 68-year-old Wilson punched law enforcement officers, attempted to take their shields, and threw objects at them. In that case, the United States recommended a sentence of 46-months incarceration.[74]  For violations of Sections 1512(c)(2) and 111(a), the Court sentenced Wilson to 51 months' imprisonment.  Gardner, on the other hand, has now been convicted of assaulting police officers with a dangerous weapon pursuant to 111(b), a chemical irritant.  Furthermore, Gardner repetitively encouraged other rioters to assault police; used officers' own equipment to assault them and break in a window of the Capitol; and then he entered the building, from where he encouraged others to also enter the Capitol and gave fellow rioters items for them to use as weapons against officers in the LWT tunnel.  For that reason, he must be sentenced to a lengthier incarceration time than Wilson and anything less would unjust.

*United States v. Palmer*, 21-cr-328-TSC.  Palmer is similarly situated to Gardner.  Palmer, like Gardner, deployed the contents of an OC canister directly into the Lower West Terrace tunnel onto law enforcement officers.  Unlike Palmer, however, Gardner encouraged others to assault officers and used officers' own equipment to bust in a window of the Capitol and then entered the building, from where he encouraged others to also enter the Capitol and handed out items that were used as weapons against police.  For assaulting law enforcement officers with a dangerous or deadly weapon, Palmer was sentenced to 63 months' imprisonment for violating Sections 111(a) and (b).[75]  Palmer was also not convicted of obstruction of an official proceeding.

---

[74] The government credited Wilson with being the third Capitol rioter to enter a guilty plea to a felony charge.

[75] Palmer did not receive a three-level reduction pursuant to U.S.S.G. §3E1.1, because of his post-plea conduct.  Had he received that reduction, Palmer's guideline range would have been 46-57 months' incarceration.

_United States v. Webster_, 21-cr-208-APM.   For his violence at the Capitol, this Court sentenced defendant Webster to 10 years' incarceration after his jury trial.  Webster was convicted of 111(a) and (b) for assaulting an MPD officer on the West Plaza of the Capitol.  Notably, Webster went to trial, lied under oath, and did not accept responsibility.[76]  Gardner, on the other hand, accepted responsibility.  Nevertheless, his conduct was far more vicious and far more extended. While this may not be a perfect comparator (since Webster went to trial), the government's request here is far lower than Webster, underscoring the reasonableness of this sentencing memorandum's recommendation.

_United States v. Mazza_, 21-cr-736-JEB.   After a guilty plea, Defendant Mazza was sentenced to 60 months incarceration for violations of 111(a) and (b).  Mazza used a chemical irritant on a member of MPD, but he was not convicted of obstruction of an official proceeding, nor did he cause additional damage to the Capitol building.

_United States v. Ponder_, 21-cr-259-TSC.  For swinging a flagpole at and striking police with a flagpole in violation of 111(a) and (b), Ponder was sentenced to 63 months incarceration. In addition to the same violations Ponder committed, Gardner has been convicted of obstruction of an official proceeding.

As stated above, the government had previously requested imposition of 3A1.4 n.4 in two cases: _Reffitt_ and _Judd. See supra_, at 44.  Both cases are unique, of course. In _Reffitt_, the defendant went to trial, heavily contested the government's evidence, which included proof that the defendant unlawfully possessed – as opposed to used – a firearm and threatened his family. Ultimately, Judge

---

[76] In _United States v. Robertson_, 21-cr-034-CRC, the defendant similarly went to trial based on a single felony charge of 18 U.S.C. § 1512(c)(2) and was convicted by a jury. With guidelines of 87 to 108 months, the Court ultimately sentenced the defendant to 87 months.

Friedrich sentenced the defendant to 87 months of incarceration. But the defendant in *Reffitt* was not convicted of assault, let alone with a dangerous weapon or over the course of multiple hours of conduct. *Judd*, on the other hand, threw a firecracker into the Lower West Tunnel, amongst prolonged violence that day. While the government sought a sentence of 90 months' imprisonment, the Court sentenced that defendant to 32 months' imprisonment, focusing on the inert nature of the weapon, and the defendant's remorse.

While no one case is the perfect comparator, the cases above illustrate that the government's request – 71 months – is in largely line with individuals who harm law enforcement, obstruct justice, and engaged in prolonged acts of violence. The sentence is just, necessary, and for the purposes of §3553(a)(6), warranted.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[77] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990), identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2), and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes

---

[77] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Gardner must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Gardner played in the riot on January 6.[78] Plea Agreement at ¶ 12.  Gardner must also pay another $1,500, for his role in breaking the window into room ST-2M of the U.S. Capitol. *Id.*  As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,734,783.14" in damages, a figure based on loss estimates supplied by the Architect of the Capitol in April 2022.  *Id.*  Gardner's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* PSR ¶¶ 10, 30, 129, and 152.

//

//

//

//

//

//

//

---

[78] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 71 months, which is an upward departure from the guidelines and appropriate given Gardner's conduct, restitution of $3,500, and the mandatory $100 special assessment for each felony count of conviction, totaling $300.00.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:        */s/Jacqueline Schesnol*
JACQUELINE SCHESNOL
AZ Bar No. 016742
Assistant United States Attorney
Capitol Riot Detailee
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, AZ 85004-4449
(602) 514-7500
jacqueline.schesnol@usdoj.gov