**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| v. | : | Case No. 1:21-cr-622(APM) |
| | : | |
| MITCHELL TODD GARDNER | : | Honorable Judge Amit P. Mehta |
| *Defendant*. | : | |
| | : | |

---

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**
**AND ASSESSMENT OF 18 U.S.C. § 3553(a) SENTENCING FACTORS AND**
**MOTION FOR VARIANCE**

COMES NOW, Mitchell Todd Gardner, by and through counsel, and provides the Court with his position regarding the application of the sentencing factors to the Court's obligation to impose a sentence "sufficient, but not greater than necessary to comply" with the factors found in 18 U.S.C. § 3553(a). Mr. Gardner, after accepting responsibility for his actions, requests a downward departure to 30-months of incarceration as the appropriate penalty for his conduct on January 6th. Mr. Gardner is brutally aware of the seriousness of his conduct on January 6, 2021, and that of the larger collective who gathered in violent protest that day. He has taken and continues to take fully accountability and responsibility for his actions.

**Background**

On June 27, 2022, Mr. Gardner pled guilty to Counts 2 and 3 of the indictment charging him with violating 18 U.S.C. § 1512(c)(2) (Obstruction of an official proceeding) and 18 U.S.C. § 111(a)(1) and (b) (assaulting, resisting, or impeding certain officers using a dangerous weapon) respectively. Mr. Gardner came to Washington D.C. from Ohio to participate in the rally held by the former President. Mr. Gardner had never been actively involved in politics before, although had voted for President Obama both times. Notably Mr. Gardner did not vote for President Trump when he first ran. Mr. Gardner was in a red state and when calls of a fake election went

around, supported and encouraged by the outgoing President, Mr. Gardner started to believe that this was true. To show his support, he wanted to attended the rally thrown by President Trump at the ellipse.

Prior to January 6th, Mr. Gardner did not have any plans to incite or participate in violence on January 6th. In fact, Mr. Gardner's life up until then would support this conclusion as he had never been involved in organized violence and his limited criminal history is devoid of anything even remotely similar. After the rally, Mr. Gardner followed the large crowd and later came to realize that they were headed to the Capitol. Thinking this is where the protests were going next, Mr. Gardner followed. Mr. Gardner describes the feeling of the crowd had shifted. It had more hype and it grew increasingly loud as they approached the Capitol.

Once at the Capitol, Mr. Gardner engaged in violent behavior along with the mob that had gathered at the Lower West Terrace. Mr. Gardner sprayed a large cannister from outside the tunnel and used the same cannister to attempt to break a window. It is clear from the video footage that Mr. Gardner was caught in a frenzy of the mob that was acting with the same violent intent. Knowing that he alone is ultimately responsible for his decisions, Mr. Gardner stands before this court having pled guilty and takes full responsibility for his actions that day at the Capitol. Actions that he realized as soon as he detached from the mob were entirely wrong, outside of the norm of his lifestyle, and unbelievable to him even moments after.

Mr. Gardner's sentencing guidelines provide a range of 46 to 57 months. Mr. Gardner turned himself in, remained on pretrial supervision without incident, and submitted to in-patient sober living prior to surrendering himself voluntarily after his plea, a year later. Given Mr. Gardner's life struggles until this point, the contributions he's made to society at such a young age, his lack of serious criminal history, and his known record of being entirely compliant with

court orders pretrial, Defendant requests a downward variance to a period of incarceration of 30-months.

As demonstrated in the attached letters from family and friends, Mr. Gardner's character and his pretrial record will ensure that he fulfills the obligations that the Court imposes on him. This commitment should be both encouraged and fostered through a sentence that appropriately balances punishment, deterrence, and rehabilitation.

<u>Argument</u>

**A.**   <u>**The Court shall impose a sentence sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553(a).**</u>

"The court shall impose a sentence sufficient, but not greater than necessary, to comply with" 18 U.S.C. § 3553(a)'s mandates.  These include considering the "nature and circumstances of the offense and the history and characteristics of the defendant," reflecting the seriousness of the offense, affording adequate deterrence, protecting the public, and providing necessary rehabilitation to the defendant.  18 U.S.C. § 3553(a)(1-2).

In *United States v. Booker*, 125 S.Ct. 738 (2005), the United States Supreme Court restored to sentencing judges the power to use discretion in determining appropriate sentences. "In the wake of *Booker*, therefore, the discretion of a sentencing court is no longer bound by the range prescribed by the sentencing guidelines.  Nevertheless, a sentencing court is still required to 'consult [the] guidelines and take them into account when sentencing.'" *United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005) (quoting *Booker*, 125 S.Ct. at 767).  In light of *Booker*, "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence." *Id.* (citation omitted). The guidelines should be a "starting point and the

3

initial benchmark," but are not the only factor when considering a fair sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). The facts of Mr. Gardner's case, while serious and worthy of punishment, do not call for the imposition of a sentence as high as the Guidelines would suggest and Mr. Gardner would argue that the sentence proposed by the defendant is appropriate here in light of sentencing factors.

**B.**      **18 U.S.C. § 3553(a) Factors to Consider in Sentencing.**

   **1.**      **Nature and Circumstances of the Offense.**

Mr. Gardner grew up in a red state. This is not offered to excuse Mr. Gardner's behavior but to explain the huge discrepancy between his life and nonviolent choices otherwise and his behavior the day of January 6th. As stated above, Mr. Gardner voted for President Obama both times and did not vote for President Trump when he ran for office. He believed President Trump's candidacy to be a joke, a publicity event for a celebrity. The years that Trump was in office, everyone around Mr. Gardner, discussed and exalted Trump. He was surrounded by people who only watched a certain media outlet, only believed and spread the misinformation that was now popular on most right-wing news channels and outlets.

Mr. Gardner has never been politically active, much less a political extremist. However, during Trump's presidency, Mr. Gardner flourished financially and was able to provide for himself and his family and started to believe the misinformation that President Trump was spreading. Misinformation such as President Trump is good for the common, hard-working American while democrats, if in power, would raise taxes and take away those American's hard-earned money.

After the election of 2020, President Trump along with his administration started to spread rumors that the election was "stolen" by the Democrats.[1] He refused to concede and made false claims that the election was corrupt, the process was corrupt, and that democracy was in danger, if his supporters did not do something.

Millions of Trump supporters were convinced that he was right—the election was stolen. Mr. Gardner lived around many of these supporters and heard this rumor day and night. He slowly started to believe what the current commander-in-chief was telling the nation—that the election had been stolen and the way of life in America was about to change. "President Trump invested millions of dollars of campaign funds purposely spreading false information, running ads he knew were false, and convincing millions of Americans that the election was corrupt and that he was the true President.[2] In fact the "stop the steal" rally was organized to continue inciting the same suspicion over the democratic process and to ensure that people were angry at the results of the 2020 elections as a last-ditch effort by Trump to maintain power.

This is not to excuse Mr. Gardner's behavior. He knows and will tell the Court that he solely is responsible for his actions at the end of the day. However, this information is relevant for the Court to consider, especially when by all indications, Mr. Gardner before January 6th was a loving, caring, family-man who respected those around him and was not capable of violence. Mr. Gardner came alone to the Capitol that day, he did not plan weeks in advance of his trip, he did not bring with him items such as knives, weapons, guns, or any riot gear. He did not wear bullet proof vests, gas masks, or any other type of gear suggesting violence. While consumption of the news and participating in the rally is no excuse for his behavior once on Capitol Grounds,

---

[1] https://www.washingtonpost.com/politics/trump-election-voter-trust/2020/12/20/00282aa6-407a-11eb-8db8-395dedaaa036_story.html
[2] *See* https://www.npr.org/2022/06/10/1104156949/jan-6-committee-hearing-transcript

it does demonstrate why Mr. Gardner was wrapped up in the day's events and acted entirely out of character for himself and why this is not likely to ever happen again.

Mr. Gardner did not even hold strongly-held beliefs that the election was stolen, nor was he particularly angry before arriving in D.C. for the rally. He thought it was an important historical event where the current President wanted to speak about how democracy was ending in America from that day onwards. His diluted feelings over the election results turned to patriotic frenzy after the rally, after following other rioters onto the Capitol grounds and after witnesses the actions of those around him on the grounds. There is no evidence to support that Mr. Gardner came to the rally with intentions of doing anything else above participating in a rally. He did not obscure his face, he did not arm himself, he wore street clothing, he did not carry flag or other memorabilia.

He now stands before the court knowing that his actions were not just wrong but extremely harmful to those who were in and around the Capitol. But he knew this as soon as he walked off the Capitol Grounds and saw the Lincoln Memorial in front of him. It brought a moment of sobriety as he realized what he had done. While he didn't grasp or appreciate the seriousness of his actions in that moment, after seeing the coverage from a birds-eye view, Mr. Gardner stands before this court deeply ashamed of his actions and that he added to the violent mob.

The events leading up the January 6th and the events the day of also show that Mr. Gardner is not at a risk of recidivism or of political extremism and will not ever replicate his behavior of January 6th. The unique set of circumstances leading up January 6th and the day of ensure that not only does Mr. Gardner understand the grave seriousness of his actions from that

day, he is not at a risk to ever repeat them and thus does not need a lengthy period of incarceration to be adequately deterred and punished.

While at the Capitol and after being in the mob of people who were getting whipped up in a self-claimed patriotic frenzy, Mr. Gardner made his way to the Capitol. Once there, Mr. Gardner was on the Lower West Terrace for approximately 20 minutes. While there, he shouted "drag them out," "pull the cops out," "fight for Trump." This was all well after the initial breach of the Peace Circle and the breach of the first officer line. This was also well after the initial breach of the interior of the Capitol. At some point, Mr. Gardner stands on a window ledge and strikes and damages the window. He also uses that same cannister to spray into the tunnel from outside, striking law enforcement officer directly on their face shield. Lastly, Mr. Gardner entered Senate Terrace Room 2 Mezzanine of the U.S. Capitol.

     **2.**     **<u>History and Characteristics of the Defendant</u>.**

Mr. Gardner was a 32-year-old man at the time of this incident. He is currently 36 and has been incarcerated for nine months. Mr. Gardner was arrested for the present offense on June 25, 2021, and held without bond. He was released on personal recognizance on July 8, 2021, and ordered to report for, and comply with, Real Recovery Sober Living treatment. On September 8, 2021, Mr. Gardner was released back to his home with drug testing and treatment as needed. Counsel confirmed with pretrial supervision that Mr. Gardner remained entirely compliant and did not have a single positive drug test. Mr. Gardner remained out on pretrial release until his plea and self-surrender on July 8, 2022. For a year, Mr. Gardner remained entirely compliant of this Court's orders and continued to work to improve himself.

Mr. Gardner had a tough upbringing and adolescent. His parents divorced when he was a toddler. He had infrequent contact with his father and was raised primarily by his mother and

paternal grandmother. Mr. Gardner's mother remarried and while he was close to his stepfather, his stepfather was verbally abusive and would "sometimes rough up" his mother. Mr. Gardner grew up isolated and did not have many friends. His mother worked to support him and his siblings throughout his childhood. He grew up living new his paternal grandparents and they became like parents to him.

Mr. Gardner's biological father was an excessive drinker and while there is no diagnosis of addiction, Mr. Gardner faced issues of addiction early on his life. Mr. Gardner was married in 2012 however, they divorced 2 years later due to Mr. Gardner's substance and alcohol abuse. He did not gain custody of his children due to the same issue. Despite this, Mr. Gardner maintained a close relationship with his children, provided for them financially, and to this day maintains a close relationship with them. Not wanting his children to lack a close relationship with their father, he did everything he could to maintain that relationship.

Mr. Gardner overcame his significant substance abuse addiction and then continued to work with those in the community that struggled the same way. He personally sponsored 15-20 people through their recovery process and ensured that they would stay on the right path. His contributions to those around him who were struggling is a great indicator of the type of person Mr. Gardner is. His selflessness with time and resources is a recurring theme throughout the letters of support counsel received.

To understand Mr. Gardner is to see who he is through the lens of those closest to him. Notably, the letters of support that Mr. Gardner received from community members were not just family members. The letters received by counsel are letters from those who have known Mr. Gardner throughout his struggle with substance abuse or are people whose lives Mr. Gardner has touched through his own work to sponsor those on their own road to recovery.

8

The letters from his family and friends more fully demonstrate all aspects of Mr. Gardner, through thoughtful and loving support, while acknowledging his wrong. These family and community members are not blinded by their love for Mr. Gardner. They are soberly aware of the consequences of his actions and are the ones truly aware of his remorse.

During the pendency of this proceeding, Mr. Gardner has relied on these friends and family.  He needs his family, and his family needs him.  They are aware of the severity of this offense.  They will support him and ensure that he refrains from any future criminal conduct. These letters speak not only of his rehabilitation, but also to the supportive and faithful network upon which Mr. Gardner can lean, which further supports future deterrence.

**3.**      **The Need for the Sentence to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.**

The nature and circumstances of the offense and of Mr. Gardner must be balanced with imposing a sentence that reflects the seriousness of this offense, respects the rule of law, and provides a just punishment.  Mr. Gardner understands the seriousness of this conviction and the entirety of what occurred on January 6, 2021. This is why he took responsibility for his actions and pled to the offense saving valuable judicial resources.

Mr. Gardner takes full responsibility for his actions and his role.  He has spent every day since January 6 reliving that day, and he faces the constant reminder of his wrongdoing.  Likewise, he suffers from the seriousness of his offense every day, whether with having to face friends and family members, the indelible shame this has brought upon his law-abiding family, or living in the uncertainty of losing everything he has worked for over the last two years.  Every future job application will require the disclosure of his crime and he will forever live with the ignominy of his actions.

As serious as Mr. Gardner's actions were, they must be viewed in context when considering sentencing. Unlike others, Mr. Gardner did not bring any weapons with him to the rally. Nor did he bring any items that would suggest he had planned to participate in any of the wrongful conduct he did participate in. Mr. Gardner did not remain boastful of his conduct after January 6th, unlike many other defendants.

### To Afford Adequate Deterrence to Criminal Conduct.

Mr. Gardner has been adequately deterred and is not likely to engage in future criminal conduct. This felony conviction serves as a greater punishment to him and deterrence for him as opposed to someone with a more extensive record. He will now live with its consequences daily, both personally and professionally.

He is certain to face consequences far beyond what he would have previously imagined. He faces harassment and embarrassment, and his future prospects will be more limited. This will harm him financially, but also emotionally as he knows he will not be able to support his family in the same way. Prior to January 6th, he was finally seeing financial success. He was able to pay off his grandparent's home, pay for his mother's medical bills, and help support his children adequately. After this conviction and the period of incarceration he faces, he will certainly not be able to achieve the same level of success. He accepts this reality, and he understands that real consequences are just and appropriate, but he is deterred before he even arrives at sentencing.

His family faces constant harassment, his name is forever associated with his actions on the internet and he will always be branded by his offense that day. He accepts this reality, and he understands that real consequences are just and appropriate. These are goals that the principles of sentencing should foster.

A lengthy incarceration period is not necessary to adequately deter Mr. Gardner or the general public. The National Institute of Justice, Department of Justice, issued its finding that "prison sentences are unlikely to deter future crime," and "increasing the severity of punishment does little to deter crime." U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. Of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Justice in America 199 (2013)).[3] Further, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006)."

Given Mr. Gardner's positive impact on society and those around him, his ability to live a productive life despite difficult life circumstances, and his ability to support all those around him serves as a better deterrence than a harsh punishment. Mr. Gardner is eager to get back to his children, his family, his work after serving his time for this case. A sentence recommended by the defendant is appropriate in this case given his complete and unwavering remorse, January 6th being an anomaly in his otherwise productive and selfless life, and his early and consistent acceptance of responsibility. He is deterred.

## **To Protect the Public from Further Crimes of the Defendant.**

Mr. Gardner is not a danger to the community.  The lack of violent behavior prior to January 6th and the specific circumstances of January 6th ensure that he is not a danger to the community at large. By all accounts from friends and family members, Mr. Gardner is unlikely to follow down a path of future criminality. Mr. Gardner is a not a dangerous individual or poses any threat to the public. Further, Mr. Gardner's conduct on January 6 is isolated to a unique set of circumstances that unfolded that are not likely to be replicated.

---

[3] Available at https://ncjrs.gov/pdffiles1/njj/247350.pdf

C.    __Just Punishment and the Kinds of Sentences Available.__

Mr. Gardner's request for 30 months of active incarceration satisfies the needs for a just punishment. He has a felony conviction now and that in and of itself is extremely punitive. The conviction affects job opportunities and will remain with him for the rest of his life. A period of incarceration of 30-months will allow him to be adequately punished, maintain some semblance of a relationship with his really young children, allow him to remain in the folds of society. So that when he returns back home, he is able to make the adjustment that many defendants cannot. Mr. Gardner has proven that he is a productive member of society who not only takes care o fhis own family but helps several others maintain their sobriety. Because of Mr. Gardner, many like him have successfully fought and overcome addiction and have not resorted to a life that involves the criminal justice system.

This Court has greatly varied from sentencing guidelines or the requests made by the Government due to fact-specific analysis in previous cases and should afford Mr. Gardner the same due to his complete acceptance of responsibility, his work in the community, and his expression of remorse. In *U.S. v. Rodean*, 21-cr-57 (TNM), Judge McFadden sentenced a young man (28-years-old) after a bench trial to 240-days of home confinement instead of the 57 months that the Government requested. Judge McFadden's ruling was based off of the fact that Mr. Rodean was diagnosed with Asperger's and the Court found that he was influenced by other rioters, namely Jacob Chansley. Mr. Gardner was acted under the same mob mentality. In *U.S. v. Mark Leffingwell*, 21-cr-5-ABJ (D.D.C. 2021), defendant entered the Capitol Building, positioned himself in front of a line of rioters, chanted at officers, yelled at them, and then proceeded to strike two officers in the head. Leffingwell "first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually

punching Officer D.A. once more." ECF no. 31. The Government sought a sentence of twenty-seven months of incarceration after his conviction under 111(a)(1).

Similarly, in *U.S. v. Webster*, 21-cr-208-APM (D.D.C. 2021), a jury convicted Mr. Webster on six counts, four of which were with a "deadly or dangerous weapon," namely a flag pole. Mr. Webster was convicted of confronting officers, screaming obscenities at them, wielding a flagpole as a weapon, hitting the bike rack directly in front of an officer with enough force to break the metal pole in half. Mr. Webster continued his attack on the officer by physically engaging with him, struggled with him on the ground, and attempted to rip of the officer's mask. The Government requested 210 months of incarceration and the Court imposed 120 months of incarceration, imposing a significant downward departure from the low end of the guidelines.

### Conclusion

For these reasons, Defendant respectfully requests a period of 30-months of active incarceration along with the fines and restitution outlined in the Probation Office's recommendation.

Respectfully submitted,

Mitchell Todd Gardner
By Counsel

___/s/_____

Farheena Siddiqui
D.C. Bar No. 888325080
Law Office of Samuel C.  Moore, PLLC
526 King St., Suite 506
Alexandria, VA 22314
Email: fsiddiqui@scmoorelaw.com
Phone: 703-535-7809
Fax: 571-223-5234
*Counsel for the Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 3rd day of March, 2023, I electronically filed the foregoing with the Clerk of Court Using the CM/ECF system, which will then send a notification of such filing (NEF) to all relevant parties in this matter.

_____/s/_____

Farheena Siddiqui
D.C. Bar No. 888325080
Law Office of Samuel C.  Moore, PLLC
526 King St., Suite 506
Alexandria, VA 22314
Email: fsiddiqui@scmoorelaw.com
Phone: 703-535-7809
Fax: 571-223-5234

# EXHIBIT 1

January 19, 2023
Barbara J Tuggle
91 Meadow Lane
Johnstown, Ohio ,43031
614-935-2267
To the honorable Amit P. Mehta,

Your honor, my name is Barbara J Tuggle. I am the mother of Mitchell "Todd "Gardner. So many things have changed in the last six months.  God put it in my heart to send a follow up letter.  I was at Bath & Body Works Logistics for eighteen years in leadership roles. In addition, I worked Saturdays for an RV dealership as a receptionist parttime for over seven years. I no longer work for Bath & Body Works. The stress of this, all the responsibilities of leadership, and working two jobs took a physical and mental toll on me.  I was blessed to go fulltime at my parttime job. It is less money, but they are very understanding of our situation. They pray with me often.

As I stated previously, I understand what my son did was wrong.  He tells me almost daily that he regrets what he did. He has told me so many times that it was like he was watching himself from outside his body.  Sadly, Todd's grandmother passed away January nineth. He is so grief stricken and the guilt of not being there for her last breath and missing her funeral, will stay with him the rest of his life. She was like a second mother. Joan helped me raise him. Todd was such a grandma's boy. She had no problem letting everyone know that he was her favorite. Unfortunately, his grandfather is under hospice care and I am sure, now that Joan has passed, he will follow very soon.

Todd knows that being incarcerated in not a vacation. He has told me so many scary stories. I makes me physically ill that I can't fix it.  The guards refused to allow communication from his attorney. He has gained so much weight from having to buy junk food because the food portions were so small. Todd told me that not being able to go outside while he was at Northern Neck Regional Jail was life changing.  He said he will never take fresh air for granted ever again. I worried about him so much because they would not give him his medications for nine days.

Todd misses his kids so much.  I know my son and he will abide by every stipulation to be able to be with his kids and family again. Adeline and Miles need their dad for love, guidance, and financial support.  I cry every time Adeline and Miles tell me that they miss their daddy. I lost my composure when Adeline told me she was afraid someone would hurt her daddy.  I just told her that God will protect him.  Her anxiety levels are so high that her mom took to her the Children's Hospital for help. Miles is still having trouble managing his ADHD. I try to help, but I am not daddy.

As a mom it breaks my heart to see him so broken. His sister is getting married in August. I am praying he will be home to stand with her as she starts this new chapter of her life. She and Todd are extremely close. She offered to wait until we knew when he would be back home. Todd told her to have the wedding. He doesn't want her to move her date for him. I would love to surprise her with Todd sitting in the front row on the biggest day of her life.

Your honor, Todd has so much love family support. We come from a large family and we will be there for him.   We are all upstanding members of our communities. He will have all the love and support he needs. I want him to be here for his grandfather's final days on this earth. Mostly, Miles and Adeline need their daddy.  I pray for Todd every day, several times a day. I watched the movie, "The Green Mile."  The other day. I prayed that God would give you the gift to see inside Todd's heart. I prayed that you could really feel how good of father, son, and man

my son is and that this mistake does not define him. He is so remorseful. I am asking for him to have a chance to prove himself to you and let him come home. We are God and family strong.
Sincerely,
Barbara Tuggle

# EXHIBIT 2

July 22, 2022
Barbara J. Tuggle
91 Meadow Lane
Johnstown Ohio, 43031
614.935.2267

To the honorable Amit P. Mehta,

My name is Barbara J. Tuggle, I am the mother of Mitchel "Todd" Gardner II. I understand what my son did was wrong. It didn't sink in that this was real until a couple weeks ago when he came up to visit and had to go to the DC jail and texted me that he was okay and that he loved me. Todd is one of the most loving and kind people I know. His actions that day are no reflection of him as man, son, grandson or father. He is overly generous, kind, and loves his family beyond words. In addition, his need to help those with addiction is truly commendable.

I want to list everything Todd has done for me as a child and as an adult, but I respect your time. Most kids have to be taught to be kind and to be giving, Todd was made that way. When he was twelve years old, I had a very high-risk pregnancy with cervical cancer cells. I had to stay in bed for three months and still try to care for my family. Todd would not let me do anything. Every morning, he asked me what chores needed done. This twelve-year-old boy learned to laundry, did his regular chores, and made sure his younger brother was cared for every day. Todd made sure I rested and would constantly ask if I needed anything. Then, when his sister was born, she stole his heart. He helped take care of her so I could rest and heal. It was a difficult time, but with Todd's love and help I was treated for the cancer cells and pretty healthy by the end of the year. Todd and his baby sister, Haley, have been very close since the day she was born. He would hold her all the time and talk to her as if he was her father. She didn't walk until she was 15 months old because he carried her everywhere. Even as a sixteen-year-old boy, he always had time for her. Haley was the first person he took out when he got his license. Most importantly, even as adults they are in awe of each other. That being said, Todd helped Haley through a very difficult time in her life. When Haley was fifteen, she was under a lot of pressure in a gifted program at school and dealing with her father making our lives unbearable during a divorce. She turned to harming herself and alcohol. She had been hospitalized several times. Nine times by the time she was eighteen years old. Todd brought her back to us. He talked her through the importance of sobriety and the AA program. Getting her better was his mission. His love and compassion saved her from herself. She celebrated four years of sobriety last week. She is a well-respected jeweler and business woman in Mount Vernon, Ohio. I know it is her accomplishment, but without Todd's love and constant support, she may not be here today. Todd helped her find her self -worth. He refused to give up on her. I am forever grateful. He now helps several men in AA. I always wonder how many people he has saved from the evils of alcohol and drug addiction.

Todd is a grandma's boy. I am not jealous. His grandma Joanne (his father's mother) is one of the reasons Todd is the loving man he Is today. They were instrumental raising him. As a single mom, I needed help while I worked a job with crazy hours. Todd spent every weekend with them. His grandparents took him to church every week and on vacation to visit his dad every year. Phil and Joanne are in their eighties and in very poor health. His grandfather is on Hospice and his grandmother will most likely pass soon after. She had lung cancer and has never fully recovered. They had to take a loan out against their home to cover expenses like medications and hospital bills. Todd hated that they were struggling financially and couldn't focus on getting better. He told them he wanted to make a few payments for them as a Christmas gift. He actually paid off their house for them. Needless to say, they were overwhelmed. Todd visited them before reporting to DC. He apologized over and over letting them down. I know, as he sits in the DC jail, that he is more worried about them than he is himself.
Todd and I talked a lot while he visited. His biggest regret is letting his children down. Adeline is ten years old. She is bright and beautiful and loves her daddy. They talk almost daily and act down right silly. Todd makes sure to come up for her birthday and they are comical. The ordeal has made her anxiety

extremely bad. She fears her daddy will get hurt or not come back. Adeline is in an anxiety program through Children's hospital to cope. He has apologized to her so many times for hurting her. Miles is eight years old and is just like Todd. He loves deeper than most kids just like his dad. His kindness is beyond measure and doesn't want anyone to be sad. The very thing that is breaking Todd's heart is not being able to see them. He will move mountains to make it up to them. Todd and his ex- wife are working hard to make sure the kids understand that they are loved. Todd made me promise to make sure not to miss any of the kid's birthdays, ball games, and plays. I assured him I would be there and take as many pictures as possible.

My relationship with Todd is one of love and admiration. I love him more than life itself. Todd has been a fighter since he took his first breath. He turned blue at birth and was brought back to me. I knew from that minute he was special and very determined. When Todd was four years old, he had a life-threatening asthma attack and was life flighted to Children's Hospital. They would not allow me to fly with them because he might pass during midflight. I drove so fast. By the time I got to the hospital his left lung partially collapsed, but they had him stable. When I arrived at the hospital and saw that they had him stabilized, I broke down crying. He was more worried about me.  I laid in the bed with him to comfort him. He started rubbing my arm telling me it's okay.  Even as an adult, he called me and came over all the time. A few years Todd was having financial issues and didn't have money to get Christmas gifts for his kids. I bought the kids gifts and made them from Todd. He was so grateful. He has thanked me more times than I can count. Every time we talk, he asks me if I need or want anything. He is an extremely grateful person. In addition, a couple years ago, I was hospitalized for 6 days with a very bad illness. It was right after Christmas and Todd had just flown back to Florida. I didn't want to worry him. I let him know after I was released. Todd's feelings were so hurt. I know he would have flown back to take to care of me. Lastly, I had knee surgery in February and he insisted on helping me with copays. I told him I was good, but he sent money anyway.  He drove me nuts calling and checking on me. I am so proud that he is so loving, thoughtful, and caring.

  Your honor, as I type this letter, my biggest fear is that I can't adequately explain to you how great of a man my son is and how much of himself he gives to help others. I can't possibly paint a picture for you to see how his absence will affect his children, grandparents, me, his siblings, and the people he helps with addiction. He will never forgive himself If he never gets to see his grandparents again. His sister is holding off her wedding because she will not get married without him as her man of honor. Like I stated earlier, I know Todd made a mistake. His actions that day are not of his character or heart. He has never been in trouble. When Todd was home a few weeks ago, he said he hated that I worked two jobs. I assured him I was okay with it. He told me that when he gets home that he wanted to take care of me more. My heart melted. Todd wants me to have more time to be the kids and to relax. That is my son.  A man with a heart bigger than the outdoors.   The only thing I can do is to continue to pray that God grants you the gift of seeing in Todd's heart. I pray you take into consideration that my son has no prior convictions. I beg the court to allow Todd to be with his grandparents so they can leave this Earth in peace. I hold close to my heart that you will use your wisdom to understand that his children need him for love, guidance, and financial support. I am grateful for allowing me to provide you with a small glimpse into Todd's life. As I stated, I could make a list that would go on for pages, but will be respectful of your time.
Sincerely,
Barbara J. Tuggle

# EXHIBIT 3

The Honorable Amit P. Mehta
United States District Judge
United States District Court
for the District of Columbia
333 Constitution Avenue, NW
Washington, DC 20001

       Firstly, thank you for allowing me to write this letter regarding the character of Mitchell "Todd" Gardner II. I know about his actions on January 6th and although I do not condone them, I do not believe it is representative of Todd's usual behaviors and actions. I am Haley E. Tuggle, and Todd is my big brother. In this letter I will give you a glimpse into my life, but mainly describe my relationship with Todd and the way he has impacted myself and others.
Up until a recent career change to due to moving, I have been in the jewelry industry. I worked for a family-owned jeweler in Mount Vernon, Ohio. In this role I was able to serve my community and become close with many clients. I also participated in local events and was involved in the Chamber of Commerce as a representative of the company. Although dedicated to my career, family is still of upmost importance to me and the biggest aspect of my life. Todd and I have been close for as long as I can remember. As a little girl I always looked up to my big brother and still do. One of my favorite memories of Todd from childhood is him taking to me to Build-a-Bear and him helping me pick out a stuffed animal, finding the perfect outfit and naming the bear. Afterwards, he took me for a Happy Meal at McDonald's and looked after me while I played there. My childhood is filled with loving memories of Todd.

Into adulthood, he helped me in ways I am forever grateful for. At 18 years old, my personal struggles with alcohol and addiction reached a bottom. While I was in a detox center, Todd visited me everyday and even brought me an AA Big Book. He was my biggest support during this time. He was and is my rock. Todd played an instrumental role in my recovery. Today I am over 4 years sober. This is a role Todd also played for others. Todd and I attended a recovery event together and hung out with other sober people. A newcomer we sat with said to me, "Todd was the first person to befriend me in the program. He saved my life." He sponsors men in recovery and is always doing whatever he can to help others.

Beyond his actions in recovery, he is successful in his career of roofing sales and will continue to be after his release. He even used money he earned in this career to bless his grandparents. While they are struggling with their health and finances, Todd paid off the loan on their home. He is very close with his grandparents. Todd is a family man.

My fiancé and I are in the process of closing on a house and want to start planning our wedding. The thought of Todd not being at my wedding is incredibly saddening. It is my hope to postpone this until Todd can be there. I need to have both of my brothers there on the day that I walk down the aisle.

I know Todd regrets his choices from January 6th. He regrets the time he is losing with his children and family. This will not be a pattern of behavior for him.

Thank you for using your valuable time to read this letter. The charges Todd is facing are serious, but I pray you see beyond Todd's actions on that day. He is a man with a huge heart and

a drive to help others. Please keep this in mind when viewing his case. I sincerely appreciate your time and consideration.

Hayley Tuggle

# EXHIBIT 4

To: To Whom it May Concern

RE: Mitchell Todd Gardner

My name is Alyssa Hardesty (MSW RCSWI) and I am writing a character letter on behalf of Mitchell Todd Gardner.

I have known Mr. Gardner for almost two years. He came into my life as my younger brother's narcotics anonymous sponsor. Prior to moving to Tampa, Florida and connecting with Mr. Gardner, my brother was residing in West Palm Beach, Florida and struggling with drug addiction. He moved to Tampa in October of 2021 to reside, as I reside here and I am a support for him. Mr. Gardner almost immediately not only took my brother on as his sponsee, but he also helped him by hiring him and giving him an employment opportunity so that he could get on his feet. After this was established, I spoke with Mr. Gardner on the telephone to make sure this was a legitimate arrangement. I can honestly attest that I took an immediate liking to Mr. Gardner. He was providing my brother stability not because it benefited him in any manner, rather because he is a good person. I am a clinical social worker and I am able to identify and recognize good characteristics and bad characteristics in others. Mr. Gardner appeared to have all good characteristics, with nothing but good intentions. During my brothers time with Mr. Gardner, he was able to stay sober, as well as make revenue to support himself due to Mr. Gardner employing him.

Unfortunately, due to legal issues with the January 6th capitol riots, Mr. Gardner was unable to sponsor my brother for some time and during this time, my brother's sobriety slipped and he ended back up in rehabilitation this past March. Shortly after, I called Mr. Gardner and requested that he sponsor my brother once more, as well as asked if he was able to give my brother his job back. Mr. Gardner agreed to both requests without hesitation and during my brothers time in this rehabilitation, Mr. Gardner also went to visit him.

I have one personal memory in which Mr. Gardner had assisted me. I had a flat tire and was sitting at a Wawa on a hot Sunday afternoon calling Triple A for assistance. I was speaking to Mr. Gardner and I had informed him on what was occurring. He told me to cancel my Triple A request and that he would be at the Wawa in thirty minutes to change my tire for me. He did so without hesitation and when he showed up, he did as he promised.

I am thankful for Mr. Gardner. He is a true, genuine person who deeply cares for others. He has not only impacted my brother in a positive manner, but he has also been a support for me and my family, which you do not often find.

Please take this letter into deep consideration and recognize the good that this man has done. If you would like to contact me, please feel free to do so at (443) 235-4181.

Sincerely,

Alyssa Hardesty, MSW RCSWI

# EXHIBIT 5

I am writing to you on behalf of Mitchell Todd Garner.

Just a small background on myself, I am a gainfully employed senior homeowner, sober and actively involved in Alcoholics Anonymous 17 years.
I encountered Todd about 4 years ago, when he too became actively involved in his own sobriety.  Attending and chairing meetings, service work to the level of the district office and mentoring others.
While I don't interact with Todd on a social level, my observation of him in the fellowship has left me much impressed.  I believe he has made a beginning on restoring his life, in spite of any errors he has made along the way.  His attitude after his arrest and his perspective regarding his incarceration has been extremely inspiring to me and others.  The courage to maintain a good attitude in spite of adversity is something Todd has definitely displayed, and his ultimate acceptance and responsibility of his behavior is also and example we all can benefit from.  I am proud to call him my friend.

I plead on his behalf to be lenient toward him as he is much missed in our community.  Thank you very much for accepting and reading my letter.
With much respect,
Kathleen G McCurdy
3048 Royal Tuscan Lane
Valrico Fl 33594
813-468-0669

# EXHIBIT 6

Date: February 13, 2023

Atten: To Whom It May Concern

Re: Mitchell Todd Gardner

My name is Brent Horn. I am writing this letter as a character reference for Mr. Gardner.

I have known Mr. Gardner for almost two years. He is a member of sobriety program and was doing very well before the January 6th incident. He was making great gains in the program and was a person of support for others. He had gainful employment and owned his own home. He was looking forward to a new beginning in his life. It is truly sad that so many good people were swept in the crowd on January 6th. It would be very unlike Mr. Gardner to have planned or been an instigator. Thank you for your time and consideration in reading my letter.

Brent Horn

# EXHIBIT 7

# Kevin Keene

921 Apollo Beach Blvd
Unit 101
Apollo Beach, FL  33572

January 23, 2023

United States District Court
Judge Amit P. Mehta
333 Constitution Ave NW
Washington DC. 20001

Honorable Judge Amit P. Mehta

I am writing this letter on behalf of Mitchell T. Gardner whom I believe will be
sentenced in your court for his participation in the January 6, 2021 protest at the
Capitol in Washington, DC.

I have been a friend of Todd's for several years now and first met him through our
local clubhouse at an AA meeting.  He asked me to be his sponsor.  I'd like to mention I
am also the Chairperson for our clubhouse as well.

I am a retired executive from Enterprise Rent A Car where I was employed and a
partner for 30 plus years.

Subsequent to Jan 6, 2020 we have had several conversations regarding his trip to
Washington and his participation.  I genuinely believe Todd understands and feels that
his behavior does not represent himself, family, our community and country in a
fashion that would be seen as acceptable.

Frankly I was surprised as I know Todd to be conscientious, humble and a clear
thinker.  As an example we needed a new roof at our clubhouse. We have over 100 AA
meetings a month serving hundreds in our region.  Todd, donated significant time and
money toward the project. He was the driving force in keeping our doors open.
Without his help we would be closed today.

However what has given me the greatest joy is Todd's commitment to helping others.
I've been to several meetings with him throughout our county.  He sponsors other men
and takes the AA message into treatment and detox centers.

I'd ask that the above be considered when he is sentenced.

Sincerely yours,

Kevin Keene

# EXHIBIT 8

# Jack Difato

1971 W Lumsden Rd, Ste 238
Brandon, FL 33511

January 23, 2023

United States District Court
Judge Amit P. Mehta
333 Constitution Ave NW
Washington DC. 20001

Honorable Judge Amit P. Mehta

I am writing this letter on behalf of Mitchell T. Gardner whom I believe will be sentenced in your court for his participation in the January 6, 2021 protest at the Capitol in Washington, DC.

I have known Todd for several years now and first met him through Turnkey Roofing where he was a sales rep selling roofs. Todd has/is a hard worker - and normally worked over 60 hours a week which allowed him to provide for his family and kids. Todd was super generous as if people needed help he was always the first person to step in and offer financially.

After the Jan 6, 2020 event, we have had several conversations regarding his trip to Washington and his participation.  In addition to jail time, Todd's participation lost his job, his income, his ability to see his kids.  I genuinely believe Todd understands and is remorseful for making a poor decision which does not represent himself, family, our community and country in a fashion that would be seen as acceptable.

I'd ask that the above be considered when he is sentenced.

Sincerely yours,

Jack Difato

# EXHIBIT 9

June 29, 2022


United States District Court
Attn:  Judge Amit P. Mehta
333 Constitution Avenue NW
Washington DC  20001

Re:  Mitchell Todd Gardner, II

Dear Judge Mehta:

I am writing you asking with the court to be lenient on Todd Gardner in his
upcoming trial and sentencing.

I know Todd went to Washington DC on January 6, 2021 to take place in a rally
representing conservative voices being heard by our lawmakers relative to the
election of November 2020.  I can assure you it was not his intent to be involved in
an insurrection that day.

I personally know Todd well through Alcoholic Anonymous and have seen him
sponsor and help many individuals recover from alcoholism and drug addiction.  He
has been an active member in our group at Club Yana and Bayshore Prebysterian
groups.

I hope and pray that you will allow him to return home and continue on with his
work in the Recovery World here in Tampa, Florida.



Sincerely,

Julie O'Neill
2904 W Coachman Ave., Tampa, FL. 33611

# EXHIBIT 10



FIRST STEP
FOUNDATION

June 27, 2022

United States District Court Judge Amit P. Mehta
333 Constitution Ave NW
Washington DC, 20001

RE: Mitchell Todd Gardner II

Dear Judge Mehta,

Please accept this letter of recommendation for Mr. Todd Gardner who is before the Court for the January 6th events at the Capital.

By way of background, First Step Foundation helps addicts and alcoholics with financial aid to go to inpatient treatment and also to provide funding for the first month back into a productive life after treatment.

I am in my 35th year of sobriety and came to know Todd through Alcoholics Anonymous the past couple years. Todd has been working diligently in the roofing business and participates in AA meetings several times a week. He has expressed his deep regret for any participation on January 6th and wants to put it behind himself.

As Founder and President of a not-for-profit corporation, it seems to me that he would be of much better service by spending time on probation and working for community service here in Tampa.

I hope you will consider this in your sentencing.

Sincerely yours,

Richard T. Coley, Sr.
President, First Step Foundation, Inc.
rcoley@srallc.co
813-835-9800

*2904 W. Coachman Ave. Tampa, Florida 33611*